IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

KATIE MAPLES,
    PLAINTIFF,


V.                                          CASE NO. _____

UNIVERSITY OF TEXAS MEDICAL BRANCH
AT GALVESTON,
    DEFENDANT.

PLAINTIFF, KATIE MAPLES', ORIGINAL COMPLAINT

This lawsuit is brought by Katie Maples, hereinafter and sometimes referred to as Plaintiff, against the University of Texas Medical Branch at Galveston, hereinafter and sometimes referred to as Defendant. For good cause, Plaintiff would show unto the Court as follows, to-wit:

Jurisdiction and Venue

1.  Jurisdiction and venue lie under the Rehabilitation Act, 29 United States Code section 794, under the Americans with Disabilities Act (ADA), 42 USC §§ 12101 et seq. (1990), and under 42 U.S.C. section 1983.

2.  Jurisdiction also vests under 28 United States Code section 1331 (federal question), 28 United States Code section 1343 (civil rights).

Parties

3. Katie Maples is an individual with a disability (Attention deficit hyperactivity disorder (ADHD)) who was a student at the University of Texas Medical Branch at Galveston, School of Health Professions.

4. The University of Texas Medical Branch at Galveston is a governmental entity with a broad range of responsibilities with regard to medicine, science and education.

5. At all times material to this action, Plaintiff was a resident of Boone County, Missouri, but resided in Galveston County, Texas, at all times during her attendance at the institution.

## Facts

### Rehabilitation Act Claim

6. Plaintiff began with Defendant UTMB, School of Allied Health Sciences, as a Physician's Assistant student in the Fall of 2008.

7. Prior to entering UTMB, Plaintiff had attended and matriculated at the University of Missouri-Columbia (BA in Microbiology).

8. While at the University of Missouri, Plaintiff was diagnosed with Attention Deficit Disorder (ADD).

9. Plaintiff was able to control her disability sufficiently to complete her undergraduate courses.

10. When Plaintiff entered the University of Texas, she thought she would be able to address her disability with medication alone.

11. During the first semester, Plaintiff noticed that she was not completing any of the exams timely. Plaintiff made her first C, but had a 3.0 GPA. The other grades that Plaintiff obtained were four (4) B's and one (1) A.

12. After the C, Plaintiff requested accommodation for her ADD.

13. Plaintiff was granted accommodation in the Spring of 2009. The accommodation included additional time for tests (1 and ½ time for taking examinations) and a quiet and distraction free environment for taking the exams.

14. On March 25, 2009, the psychiatrist provided by UTMB for the care of students abruptly discontinued Plaintiff's ADD, anti-depressant, and sleeping medication.

15. After the refusal of medication, Plaintiff began to suffer from frequent panic attacks, dizziness, nausea, and problems with concentration.

16. Plaintiff was unable to get a new patient appointment with a new provider before having to take her Pharmacology exams.

17.  At the time of refusal, Plaintiff had no reason to believe that her medication would not be refilled, in that she had provided all documentation requested by the psychiatrist.

18.  After the refusal, Plaintiff complained to her Faculty Advisor and her ADA Coordinator; both did nothing and/or were unable to take actions to correct same.

19.  In the Spring of 2009, Plaintiff received five (5) B's, one (1) A; one (1) C.  Plaintiff's GPA at this point was 2.88.  Plaintiff was placed on probation after this Spring semester.

20.  Plaintiff's medication was filled four (4) days after her exam.  The medication was filled by a new physician Plaintiff paid to visit (UTMB Clinic).

21.  Plaintiff received a "C" on the exam taken without medication.

22.  The exam schedule and the results were as follows:

| Date of exam | Course Description | Course No. | Grade received |
|---|---|---|---|
| 03.31.2009 | Clinical Pharmacology | PHAS 5402 | C (79); but failed Exam 4 without medication |
| 04.03.2009 | Medication refilled by private doctor | | |
| 04.06.2009 | Diagnostic Methods | PHAS 5202 | B (passed examination taken on this date) |
| 04.07.2009 | Clinical Psychiatry | PHAS 5201 | A (passed examination taken on this date) |
| 04.08.2009 | Pathophysiology II | PHAS 5206 | B (passed examination taken on this date) |

4

| 04.16.2009 | Clinical Medicine II | PHAS 5205 | B (passed examination taken on this date) |
| --- | --- | --- | --- |
| 04.21.2009 | Clinical Pharmacology | | C (79); passed examination on Exam 5 |

23. The new psychiatrist (Dr. Ellis) wrote a letter to the University explaining that it was a mistake to take Plaintiff off her medication. The letter was ignored and the grade stood.

24. After the Summer session, on August 14, 2009, Plaintiff was removed from probation. Plaintiff had a GPA of 4.0 for the semester.

25. During the 2009-2010 calendar year, Plaintiff received on her final exams three (3) A's; three (3) B's and one (1) F in Medicine II.

26. During the Spring semester of 2010, Plaintiff failed to submit a research paper in course PHAS 6408, Medicine II. The paper was due on March 4, 2010.

27. On March 6 and March 8, 2010, Plaintiff sent two (2) emails to Dr. Ayachi requesting approval of topics for presentation and paper.

28. On March 9, 2010, Dr. Ayachi replied with an email approving both topics.

29. On March 11, 2010, Dr. Ayachi informed Plaintiff by email that her paper was a week past due.

30. Plaintiff believed the paper was due at the end of the

rotation block and not after the second rotation, as was the case in the previous rotation block.

31. When the mistake was brought to her attention, Plaintiff submitted the paper on March 21, 2010, forwarding the same by email.

32. Plaintiff would later determine that she had not sent her paper but attached notes for the preparation of the paper instead.

33. On April 2, 2010, Plaintiff turned in other documents that were due at the end of the last rotation.

34. Plaintiff inquired about her grade on April 3, 2010.

35. On April 4, 2010, Dr. Ayachi emailed Plaintiff informing her that he never received her paper.

36. On April 5, 2010, Plaintiff searched her email files and re-sent the same document, not knowing the attachment was in error. Plaintiff was given a zero by Dr. Ayachi/Dr. Rahr.

37. Plaintiff was informed that she was being dismissed from the program on May 6, 2010.

38. After this meeting, Plaintiff went home and conducted an additional search. She discovered the error.

39. Plaintiff appealed the dismissal to the Gradings and Promotions Committee. The Committee affirmed Plaintiff's dismissal on May 27, 2010.

40. On May 27, 2010, Plaintiff appealed the Committee's affirmance to Elizabeth J. Protas, Vice President and Dean. The Dean affirmed the dismissal.

41. Plaintiff has exhausted all administrative remedies.

42. At the time of Plaintiff's termination from the program, her grade point average was 3.11. Plaintiff's termination, however, was subject to the University's policy which provides:

> <u>Students are subject to dismissal if:</u>
> - Earn a "C" in two courses;
> - Earn an "F" in a course;
> - Receive a second grade of W or INC in the same course, or more than two W's or INC's overall;
> - Receive an unsatisfactory grade while on probation;
> - Fail to achieve a cumulative GPA of 3.0 or above during the term they are on academic probation; or
> - Fail to meet any of the conditions under which they were admitted to the program.

43. The policy also provides that when a student fails a rotation, the student is expected to re-register and retake the course if: (1) an average of less than "70" is earned on any component of the rotation including the final examination (2) the overall rotation average (grade) is less than "80" ("B"), or (3) a pass/fail component is not successfully passed. Because of the scheduling constraints and registration in the "D – Year period," course retakes will be scheduled at the end of the clinical year, and graduation may be delayed. This policy was not applied to Plaintiff.

44.  When Plaintiff received her second "C" (Spring of 2009), she possessed a GPA of roughly 2.94.  Upon termination from the program, Plaintiff's GPA was 3.06 [with correction of course in which obtained A later; 3.11].

## Causal Connection between Disability and Plaintiff's Treatment at the University

45.  After the first C in her coursework, Plaintiff sought accommodation in context of test taking (additional time and a distraction-free environment).  During the Spring semester 2009, Plaintiff began to orally complain to her Faculty Advisor and ADA Advisor that she was having difficulty filling her prescriptions through the University physician.  Plaintiff made it clear that she was experiencing frequent panic attacks, dizziness, nausea and unable to concentrate.  Nothing was done in context of Plaintiff's complaints.

46.  Before she made the second C (78.85) in Pharmacology, Plaintiff wrote to Jeff Baker, who was the ADA Liaison for the University, explaining the problems she was having.  She inquired as to whether something could be done to address the difference in grade (80 would have been passing; Plaintiff calculates her grade in the course at 79.85; the University official took an additional point off because of attendance – consistent with University's policy; Plaintiff provided the Professor with a physician's note for the absence in question).

47. On April 27, 2009, Plaintiff appealed her grade to Dr. Rahr.

48. On April 27, 2009, Dr. Rahr wrote an email to Plaintiff explaining that "[w]e do not allow additional work after the final examination.  You will be given a 'C' for the final grade."

49. In the Spring of 2009, Plaintiff was late to a new class; was given the wrong address.  After this event, Plaintiff was called to Holly West's office and told that she was a problem, annoying.  In addition, West informed Plaintiff that she had been sharing her sentiments with other faculty members in their weekly meetings.

50. The following week, Dr. Rahr called a meeting with the Plaintiff, also addressing Plaintiff being late for the class, and explained to Plaintiff that she needed to get her life together and that her friends were tired of dealing with her. Plaintiff's faculty advisor, Karen Stephenson, attended the meeting with Plaintiff.

51. Plaintiff felt that the meeting related to her disability in context of her transposing dates, times and places).

52. In context of Dr. Rahr's statement, Plaintiff had explained that to compensate for transposing dates, times, and

places, she occasionally relied upon friends as an additional support mechanism to address her disability.

53.   Plaintiff withdrew from her friends but did notice other actions directed towards her, including: i) being called in and verbally reprimanded for every mistake, no matter how small or common; ii) receiving a lower grade on group projects than her fellow student (same work/same revisions).

54.   Plaintiff inquired about the differing grade, no response was forthcoming from Professor Ayachi.  Plaintiff also complained to her faculty advisor without success.

55.   When Plaintiff was terminated from the program, additional reasons with respect to the dismissal were added, including the failure to report for clinical with Dr. Dorothy Merritt.

56.   This finding was made even after it was brought to the University's attention that Plaintiff's absence from the clinic was excused under University policy (medical).  All three (3) preceptors at the clinic affirmed as much, both in writing and orally.

57.   The other new reason also related to the failure to report in that Plaintiff received a zero for professionalism for failure to report to end-of-month presentations.

Disparate Treatment

58. March 12, 2009. Plaintiff was informed that it was viewed by the faculty that her disability was a problem. On the subject date, Plaintiff gave an oral presentation in front of classmates in Professor Lyons' class. Professor Lyons interrupted the presentation and demanded Plaintiff answer "I don't know" in response to each question. When others presented, this type of conduct did not occur. Students who witnessed this behavior included Judy Ann Acosta, Ashley Butler, Janna Ludwick, Kristin Willis, Nicole Lancaster, Kathleen Parks.

59. Spring semester 2009. Plaintiff was reported by Dr. Ayachi to the Program Director for being two (2) minutes late to an examination which he was proctoring for three (3) students with accommodations. Two of the three students (2/3) were late because they could not find the classroom (described as the "big room"); the other student was emailed the room number (Kathleen Parks). It was reported to the Program Director that Plaintiff was the only student who was late. Plaintiff was called in and reprimanded by Dr. Rahr. Holly West informed Plaintiff that the professors who proctored exams for students with accommodations have to take time out of their own busy schedules to provide accommodations, and being late was a further waste of their time.

60. After being dismissed from the program, Plaintiff learned that one of the rotation grades was wrong. Plaintiff

11

approached Dr. Ayachi and informed him that the grade should have been an "A" instead of a "B".

61. Plaintiff ultimately had to approach the Dean of Student Affairs. Both Dr. Ayachi and Dr. Rahr had refused to make the change. This appeal was successful.

62. It is Plaintiff's belief that her disability was a factor for her disparate treatment and that she has been discriminated against by the Defendant and its agents, employees and assigns.

## PRAYER FOR RELIEF

63. Plaintiff prays for:

   A. Equitable relief surrounding unfair and improper dismissal from the University's Physician's Assistant Program, including reinstatement in order to graduate with her class of 2011.

   B. A finding that the conduct of the University was in violation of federal law (discrimination based on disability);

   C. Attorneys' fees reasonably incurred in the prosecution of this matter;

   D. Pre-judgment and post-judgment interest;

   E. Equity relief should be invoked with respect to future acts, ordering that the Defendant, its employees and assigns, be enjoined from engaging

in acts in violation of the disability laws and under federal law. Equity relief includes monitoring the practices of the University to assure future compliance.

F.   Costs of court.

64. Plaintiff also prays for all relief in equity and under law to which she may be deemed entitled.

DATE:   November 5, 2010.

Respectfully submitted,

/S/ ANTHONY P. GRIFFIN
_____

ANTHONY P. GRIFFIN
ATTORNEY-IN-CHARGE

A GRIFFIN LAWYERS
1115 MOODY
GALVESTON, TEXAS  77550
409.763.0386
1.800.750.5034
FACSIMILE NO. 409.763.4102

STATE BAR NO. 08455300 (TEXAS)
FEDERAL I.D. NO. 4736

ATTORNEYS FOR PLAINTIFF
KATIE LYNN MAPLES

**A JURY TRIAL IS DEMANDED**

c:word.maples_katie_original_complaint_final_2010.3257