UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KATIE MAPLES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. G-10-552 |
| | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH AT GALVESTON, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM & ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case arises out of a professor's decision to give an "F" to a student with Attention Deficit Hyperactivity Disorder (ADHD) and depression who failed to timely turn in a paper. Plaintiff Katie Maples, a former physician assistant student, brought this action under the Rehabilitation Act and the Americans with Disabilities Act (ADA), alleging that Defendant University of Texas Medical Branch at Galveston (UTMB) failed to accommodate her disabilities. While Maples admits that UTMB provided her with additional time and a distraction free environment for exams as soon as she requested them, she complains that UTMB denied her the opportunity to retake exams or perform additional work for extra credit, which ultimately resulted in her dismissal from the program.

UTMB filed the instant summary judgment motion on the grounds that (1) Maples could not perform the essential functions of a physician assistant

student; (2) UTMB provided Maples with reasonable accommodations; and (3) UTMB did not dismiss Maples because of her disability or discriminate against her in any other way.[1]   The Court agrees that UTMB reasonably accommodated Maples's disabilities and that her disabilities were not a motivating factor in her dismissal.   Accordingly, the Court **GRANTS** UTMB's Motion for Summary Judgment.[2]

## I.   FACTUAL BACKGROUND

Maples enrolled in the UTMB Physician Assistant Studies Program in Fall 2008.  Prior to attending UTMB, she graduated from the University of Missouri with a Bachelor of Arts degree in Microbiology.   Maples was diagnosed with ADHD while in college, but was able to control the disorder sufficiently to complete her undergraduate courses.

Upon entering UTMB, Maples determined she was able to address her disability with medication alone and did not seek accommodations from the University; however, after having difficulty completing exams and earning a "C"

---

[1] In its Reply Brief, UTMB also asserts that Maples did not plead an ADA claim and that Maples was not "disabled" under that Act.  The Court rejects the first argument given the statement in Maples's Complaint that "[j]urisdiction and venue lie . . . under the Americans with Disabilities Act," Docket Entry No. 1 at 1, and the congruence of Rehabilitation Act and ADA claims, *see Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).  The Court need not determine whether Maples was disabled under the ADA given the remainder of its holding.

[2] The Court also grants Maples's opposed Motion to Extend Time by Three (3) Days to Respond to Defendant's Motion for Summary Judgment (Docket Entry No. 29).  The Court considered the summary judgment response and the evidence attached to it in reaching its decision.

in Pathophysiology during her first semester, she requested an accommodation. Docket Entry No. 1 at 3.  On November 10, 2008, she wrote a letter to Dr. Jeff Baker, UTMB's ADA Liaison, requesting that she "be allowed more time to take [her] examinations and given a distraction free environment to do so."  Docket Entry No. 20-4 at D4.  Two days later, Dr. Baker granted the accommodations.  *Id.* at D6.

Notwithstanding the accommodations, Maples earned another "C" during her second semester, this time in Pharmacology.  Ninety-five percent of that grade was based on five equally weighted multiple choice exams, on which Maples scored an 86, 80, 70, 72, and 82.  Docket Entry No. 20-6.  After she had taken her first four exams, Maples contacted the ADA Liaison to notify him that the psychiatrist at the UTMB Student Wellness Center had been refusing to refill her ADHD and antidepressant medications for several months.  Docket Entry No. 31-6 at 1.  In the email, she attributed her poor performance on the fourth exam to the abrupt discontinuance of medications six days before the exam, *id.*, but admitted in her deposition that for the previous exams, including the one on which she received a 70, she was still supplied with medication, Docket Entry No. 20-1 62:20–64:25, 72:3–19, 75:16–19.  On April 27, 2009, after the course had ended and Maples had received the "C," she contacted the course coordinator, the professor, and the department chair in an attempt to change her grade by retaking

the exam or writing a paper.  *See* Docket Entry Nos. 20-5 at E3; 20-6 at F3.  The professor told her that the syllabus did not offer extra credit and directed her to the department chair, who subsequently confirmed that no additional work was allowed after the final examination and that the "C" would remain.  *Id.*

After the Spring 2009 semester, Maples was put on probation and already subject to dismissal.  Under the Physician Assistant Studies Program's policy, students are subject to dismissal if, among other things, they earn a "C" in two courses, as Maples had already done; earn an "F" in a course; receive an unsatisfactory grade while on probation; or fail to achieve a cumulative grade point average (GPA) of 3.0 or above during the term they are on academic probation.  *Id.* at UTMB_000105.

Although Maples bounced back with a 4.0 GPA for the Summer 2009 semester, she earned an "F" in Medicine II in the Spring of 2010.  Maples failed to timely submit the end-of-the-term paper for that rotation, which counted for 30% of the grade.  According to Maples, she did not submit the paper on its due date of March 5, 2010 because she "mistakenly believed the paper to be due a month later."  Docket Entry No. 31-7 at 4.  On March 11, 2010, the professor, Dr. Salah Ayachi, emailed Maples stating that he would impose at least a one letter grade penalty for the tardiness of the paper and a 5% penalty for Maples's failure to attend the course's end-of-month activities.  Docket Entry No. 20-7 at G4.  With

respect to the tardiness of the paper, Maples responded:  "This is completely my fault and there is no excuse for my failure to read completely through the syllabus."  *Id.* at G6.  Maples explained that her absence was due to "nausea and diarrhea," although she admittedly did not notify a faculty member of the reasons for her absence until after she was contacted by the rotation coordinator.  *Id.*  She did not attribute the failure to turn in the paper or her absence to ADHD, depression, or any other disability.

Based on Maples's affidavit testimony, which the Court assumes to be true for purposes of summary judgment, ten days later on March 21, 2010, she completed and attempted to email her paper to Dr. Ayachi.  Docket Entry No. 31-7 at 4.  On April 3, 2010, Maples emailed Dr. Ayachi requesting feedback on her Medicine II paper.  Dr. Ayachi replied the next day:  "You should know that you have yet to submit it – more than a month after its due date.  Therefore, there is no reason to expect any grade other than Zero on work that is not submitted."  Docket Entry No. 20-7 at G9.  He also commented that it was unacceptable that she was not ready on time for a presentation she was supposed to give on March 31, 2010.  *Id.*  According to Maples, for some unknown reason, the email she attempted to send on March 21, 2010 never fully transmitted and remained in her "Drafts folder."  *Id.* at G10; Docket Entry No. 31-7 at 5.  Maples attributed not being ready

for her presentation to the battery on her laptop dying the night before, which resulted in her losing changes that she made. *Id.*

Maples then emailed Dr. Ayachi a document on April 5, 2010 that she thought was her paper, but was merely a document with notes and a copy of the outline from the syllabus. Docket Entry No. 31-7 at 5. Dr. Ayachi gave the paper a zero—because it did not meet the standards of the course and was over a month late—without notifying Maples beforehand. *Id.*; Docket Entry No. 20-7 ¶ 8. Maples's final grade for the Medicine II rotation was 55.25, an "F." *Id.*

On or about May 3, 2010, the Physician Assistant Studies faculty met and ultimately voted to dismiss Maples from the program. Docket Entry No. 20-5 ¶ 7. The department chair thereafter notified Dr. Jon Nilsestuen, chair of the Gradings and Promotion Committee for the School of Health Professions, that the faculty recommended academic dismissal based on Maples's "F" in Medicine II. *Id.* at E5. The department chair also notified Dr. Henry Cavazos, Associate Dean for Academic & Student Affairs for the School of Health Professions, of the faculty's decision, citing as reasons for dismissal Maples's numerous shortcomings in Medicine II, as well as her two "C" grades in Pathophysiology and Pharmacology. *Id.* at E6. The Gradings and Promotion Committee met on May 5, 2010 and agreed to dismiss Maples, and she was notified the next day. *Id.* ¶ 8; Docket Entry No. 31-10. Maples appealed to the Ad Hoc Student Appeals and Grievance

Committee and later to Elizabeth J. Protas, Vice President and Dean of the School of Health Professions, who both denied the appeal.  Docket Entry No. 32-7.  Now, after appealing her grades and dismissal to the faculty, the department chair, multiple committees, and the Dean, Maples seeks reinstatement from a federal district court.

## II.  STANDARD FOR REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.  DISCUSSION

### A.  Legal Standards

Maples brings her claims under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. §§ 12131–134.  The Rehabilitation Act and the ADA both prohibit discrimination against qualified individuals with disabilities; they employ many of the same legal standards and

offer the same remedies. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002)); *see also* 29 U.S.C. § 794(d) (incorporating various ADA standards into section 504); 42 U.S.C. § 12133 (incorporating section 504's remedies into Title II of the ADA). Title II of the ADA applies to public entities, whereas section 504 of the Rehabilitation Act applies to federally funded programs and activities. *Id.*

To establish a claim under either statute in "the context of a student excluded from an educational program," a plaintiff must prove that: "(1) [s]he has a disability; (2) [s]he is otherwise qualified to participate in the defendant's program; and (3) [s]he was excluded from the program on the basis of [her] disability." *Halperin v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 461 (4th Cir. 2012) (involving ADA and Rehabilitation Act claims) (citations omitted).[3]   The only

---

[3] The Court did not find any published Fifth Circuit cases involving such claims arising out of exclusion from an educational institution.  The elements listed in this recent Fourth Circuit case involving the same claims at issue here are, however, similar to the elements listed in Fifth Circuit ADA and Rehabilitation Act decisions in other areas.  *See, e.g., Hamilton v. Sw. Bell. Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998) (stating plaintiff in ADA employment case must show: 1) she has a disability; 2) she is a qualified individual for the job in question; and 3) an adverse employment decision was made because of her disability); *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997) (stating, in the context of a Title II ADA claim involving voting systems, that a plaintiff must show that 1) she is a qualified individual under the ADA; 2) she is being excluded from participation in a program or otherwise being discriminated against; and 3) such exclusion is by reason of her disability); *Chiari v. City of League City*, 920 F.2d 311, 315 (5th Cir. 1991) (listing elements in Rehabilitation Act case as 1) whether plaintiff has a disability; 2) whether she is "otherwise qualified"; 3) whether she worked for a "program or activity" receiving federal assistance; and 4) whether the adverse decision was solely because of the disability).  The minor differences in these formal categories do not affect the decision in this case which is based on the causation requirement—that the adverse decision was based on the disability—common to all of them.

difference between the ADA and Rehabilitaton Act in the application of these elements concerns the final requirement.  Under section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a) (emphasis added).  The standard in Title II of the ADA more broadly prohibits exclusion "by reason of [a] disability."  *Compare* 42 U.S.C. § 12132 *with* 29 U.S.C. § 794(a).  Thus, while section 504 establishes a "sole cause" test for causation, the ADA instead establishes a "motivating factor" test.  *Pinkerton v. Spellings*, 529 F.3d 513, 516–19 (5th Cir. 2008);[4] *see also Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503–

---

[4] The Fifth Circuit in *Pinkerton* held that section 501 of the Rehabilitation Act, unlike section 504, applies the same "motivating factor" standard as the ADA.  *Id.* at 517.  This Court assumes *Pinkerton* to be the applicable Fifth Circuit law regarding the different causation standards in section 504 and the ADA given *Pinkerton*'s in-depth analysis of the issue and the plain language of the statutes, despite the fact that more recent Fifth Circuit precedent, which does not focus on causation, equates the general standards used in section 504 and the ADA.  *See Frame v. City of Arlington*, 657 F.3d 215, 223–24 (5th Cir. 2011) ("The ADA and the Rehabilitation Act generally are interpreted *in pari materia*.  Indeed, Congress has instructed courts that 'nothing in the ADA shall be construed to apply a lesser standard than the standards applied under title V, i.e., § 504 of the Rehabilitation Act.'") (citations and brackets omitted); *Kemp*, 610 F.3d at 234 ("The RA and the ADA are judged under the same legal standards . . . .").

The Court also acknowledges that the Supreme Court's opinion in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), and the Fifth Circuit's opinion in *Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010), raise questions about the continued viability of the motivating factor standard, but notes that the Fifth Circuit has not applied those cases to section 504 or Title II of the ADA, and that courts within this district have continued to apply *Pinkerton*, *see, e.g.*, *Shepherd v. Goodwill Indus. of S. Tex., Inc.*, C-10-313, 2011 WL 3055231, at *6 (S.D. Tex. July 25, 2011).  *See generally Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc) (discussing application of *Gross* and applying "but-for" standard to the ADA); Deborah A. Widiss, *Undermining Congressional Overrides: The Hydra Problem in Statutory*

04 (5th Cir. 2002). This distinction does not affect the analysis that follows because the Court concludes that Maples's claims fail even under the less exacting "motivating factor" causation standard.

## B. Analysis

Dismissal of this lawsuit is warranted because Maples has produced no evidence demonstrating that UTMB's decision to exclude her from the program was based on her disability.[5] As with other discrimination claims, claims of disability discrimination may be established through direct or circumstantial evidence. *See Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996). Maples does not identify any direct evidence indicating that her disability was a motivating factor in UTMB's decision to remove her from the program. Nor does she even attempt to prove such discrimination through the *McDonnell-Douglas* burden shifting framework by, for example, showing that nondisabled students with similar academic performance were treated more favorably than she was.[6] Instead, the undisputed summary judgment evidence

---

*Interpretation*, 90 Texas L. Rev. 859, 909–17 (2012) (discussing application of *Gross* to non-ADEA federal statutes).

[5] UTMB also seeks summary judgment on the ground that Maples was not "otherwise qualified" to participate in the Physician Assistant program. The Court does not reach that issue given its ruling that Maples has not established that a disability caused her dismissal from the program.

[6] In fact, the only time Maples compares her treatment to that of other students is when she complains that Dr. Ayachi reported her to the program director for being two minutes late to an examination for students with accommodations even though two of the other three students were also late. Aside from the fact that this incident did not result in any exclusion or denial of

shows that UTMB's exclusion of Maples was consistent with its performance requirements and made only after multiple attempts to reasonably accommodate her disability failed. *See Hamilton*, 136 F.3d at 1052 (affirming summary judgment in ADA case because undisputed evidence established that the plaintiff was fired for misconduct not because of his PTSD).

The primary basis for UTMB's decision to dismiss Maples was her "F" in Medicine II in the Spring of 2010. *See* Docket Entry Nos. 20-5 at E5; 31-10; 32-5. There is nothing in the record that suggests Maples's disabilities caused her to receive that grade. Maples failed to timely turn in a paper worth 30% of her grade. While she offered nearly every excuse imaginable short of the proverbial "dog ate my homework," she never suggests that her ADHD or depression caused her tardiness in submitting the paper. When her professor informed her that the paper was a week past due, she explained:

> I did not write down what you said in our pre-rotation meeting because it was all in the syllabus. Unfortunately, when I went to read about the paper in the syllabus, I did not look past the information under the "Paper" heading and therefore wrongfully assumed that it was due the same time that the Primary Care paper was due, at the end of the block. This is completely my fault and there is no excuse for my failure to read completely through the syllabus.

Docket Entry No. 20-7 at G6. Maples attests that she attempted to send the paper

---

benefits, it defies logic to infer UTMB engaged in disability discrimination against her because of favorable treatment it gave to other students who also had disabilities. The relevant comparators are students without disabilities, just as in a sex discrimination case a female plaintiff would need to show that males were treated more favorably.

on March 21, 2010—over two weeks after it was due—but acknowledges that the email failed to transmit, caused in no part to her disabilities.  *See id.* at G10 ("I am not sure what happened but this morning after reading your email I found the message to which it was attached in my Drafts folder and not my Sent folder."). Maples also acknowledges that the paper she submitted on April 5, 2010—a month after it was due—did not meet the standards of the course, not because of her disabilities, but because she was "in such a hurry that [she] didn't think to double check that the document attached was the correct document."  Docket Entry No. 31-7 at 5.  Maples's professor was acting within his discretion in determining that such lapses of judgment, wholly unrelated or at least unattributed to ADHD and depression, merited a zero on the paper.[7]

Also unrelated to Maples's disabilities was her absence from "Grand Rounds" or "end-of-month activities" and unpreparedness for a final presentation. Maples failed to attend the end-of-month activities required for Medicine II without first informing the faculty.  She explained that her absence was due to "vomiting and diarrhea," but never attributed that sickness to ADHD or depression in any of her submissions or evidence presented to this Court.  *See* Docket Entry No. 20-7 at G5.  Likewise, Maples did not attribute her unpreparedness on her

---

[7] Maples presents dozens of pages of evidence documenting her professionalism and punctuality in various other courses and clinics.  *See* Docket Entry No. 34-1–2.  But this does not help her claims; rather it shows that her failure to timely submit the paper in "Medicine II" was not attributable to her disabilities because she had repeatedly demonstrated the ability to complete academic assignments in a timely manner despite her ADHD and depression.

presentation to her disabilities, but to the fact that the batteries on her laptop died and lost changes to her presentation. *Id.* at G10. Computer crashes have afflicted most students (and lawyers) at one time or another, but they are not a problem for which federal law provides any relief. In sum, the undisputed evidence demonstrates that Maples received an "F" in Medicine II because of her dilatory work habits, not because of her disabilities.

Maples focuses her claim of discrimination more on the "C" she received in Pharmacology than the "F" that resulted in her dismissal. She argues that her Pharmacology grade was caused by a discontinuance in her medications six days before the fourth of five exams, which caused her to earn a 72 on that exam. Maples's argument is called into question by the fact that she averaged a 79.5—also a "C" grade—on the other four exams she took, for which she had her regular medication. In fact, the 72 was an improvement from her third exam, on which she received a 70. And she did not request an accommodation from her professor until after the course had ended. Regardless, the Court puts less weight on this "C" than the "F" in Medicine II, given that the faculty did not even mention the "C" in its recommendation for dismissal to the Grading and Promotions Committee, Docket Entry No. 20-5 at E5, or its letter of dismissal to Maples, Docket Entry No. 31-10.

Maples also tries to avoid summary judgment by arguing that UTMB denied numerous accommodations she requested. While Maples never explicitly lists

which reasonable accommodations she believes she was denied, the Court adduces the following from her Complaint and her response to the instant motion: (1) an option to retake exams or submit a paper for extra credit in her Pharmacology course; (2) extensions on her Medicine II final paper and presentations; (3) notification from her Medicine II professor when he received her work or when her work was insufficient; (4) an option to retake courses in which she performed poorly; and/or (5) an option to remain in the program despite her shortcomings. UTMB argues that these requests were unreasonable, untimely, or not made at all.

"The ADA provides a right to reasonable accommodation, not to the [plaintiff's] preferred accommodation." *E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009). Maples's affidavit testimony and the other evidence she presents show that UTMB provided reasonable accommodations when Maples made timely requests. For instance, Maples testified that during her first semester, Dr. Ayachi, the professor at the center of many of her complaints, suggested that she contact the ADA Liaison to seek accommodations, discussed ways to address her ADHD, and told her "that it was nothing to be embarrassed of and that some of the smartest people in history had learning disabilities." Docket Entry No. 31-7 at 1. The emails between Maples and the ADA Liaison show an even greater commitment to accommodating Maples's disabilities. Indeed, almost immediately after Maples requested extra time and a distraction-free environment for exams,

UTMB provided her with such.

Maples's claim that the Rehabilitation Act or ADA afforded her the right to retake her exams or perform extra credit in Pharmacology is without merit.  First, Maples's request was untimely.  Despite the rule in UTMB's Physician Assistant Studies Handbook that "accommodations cannot be made retroactively," Docket Entry No. 20-4 at D2, Maples waited to inform anyone at UTMB of her situation until after her poor performance on the fourth exam and waited to request the accommodation until after receiving her final grade.[8]  That UTMB requirement is consistent with federal law.  *See Burch v. Coca-Cola Co.*, 119 F.3d 305, 319–20 n.14 (5th Cir. 1997) (noting that a "second chance" does not constitute a reasonable accommodation under the ADA); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (citations omitted) (noting that employee has responsibility of informing employer of disability); *see also Halpern,* 669 F.3d at 465 ("[T]he law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability.")

---

[8] Maples testified in her deposition that she requested an accommodation from her course coordinator before her fourth exam, Docket Entry No. 20-1 76:3-78:3; however, that testimony is at odds with contemporaneous emails she produced.  For instance, in an April 22, 2009 email to the ADA Liaison, Maples writes that she spoke with the course coordinator "the day after the exam."  Docket Entry No. 31-6 at 2.  None of Maples's emails to the ADA Liaison, which detail her situation relating to the fourth exam, mention that she was denied an accommodation in advance of the exam.  *Id.*  This is consistent with the affidavit of the course coordinator who did not recall Maples requesting to postpone the exam.  Docket Entry No. 20-8 ¶ 7.  Regardless, Maples admits that she has no recollection of requesting an accommodation before her fourth exam from the professor or the department chair, i.e., those with authority to grant the accommodation.  Docket Entry No. 20-1 76:24-77:4.

Second, UTMB's decision not to allow Maples to retake the tests or submit extra credit was reasonable.  UTMB was already accommodating Maples's ADHD by providing her with additional time and a distraction-free environment for tests. *See Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998) (affirming summary judgment against plaintiff who "[d]espite the accommodations, including being allowed to take her exams in a separate room and having extra time to take them, . . . failed biochemistry" and was dismissed from the program).  Additionally, contrary to Maples's claim, the decision was in accord with the Pharmacology syllabus and UTMB policy, which did not permit retesting or extra credit after the final exam.[9]  The professor noted that he could possibly make an exception if Maples made good grades on all of her other exams, but did badly on one because of her medication problem, but she, in fact, did worse on her third exam, during which she was medicated.  Docket Entry No. 20-6 at F3, F2.  Finally, no matter what accommodation could have been provided relating to the Pharmacology course, Maples still would have been subject to dismissal based on her "F" in Medicine II.

To the extent Maples advances accommodations claims regarding her "F" in Medicine II, the Court finds them to be without merit.  Maples received an

---

[9] Maples cites the Physician Assistant Student Handbook for support that UTMB policy permitted retesting, however the section she cites is distinguishable from Maples's situation because it applies to clinical rotations; final examinations; and exam grades under 70.  Docket Entry No. 31-8 at UTMB_000106.

"F" in that course after turning in an incomplete final paper over a month late. Maples complains that she was not given a chance to resubmit her paper and was not notified when her professor received her emails; however, Maples never requested an extension for the paper or for her professor to change his policy of not confirming the receipt of work submitted to him.   Maples was given multiple chances to turn in the paper, even after its due date, yet failed to turn in a paper that met the standards of the course.   While the Rehabilitation Act and ADA prohibit discrimination, they do not "erect an impenetrable barrier around the disabled [plaintiff]."   *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995). The Court must defer to Dr. Ayachi's professional judgment that the paper Maples turned in merited a zero.   *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).

The Court also finds that UTMB did not deny Maples a reasonable accommodation by refusing her the option to retake Medicine II or remain in the program despite her poor grades.   UTMB was not required to provide accommodations that would "fundamentally alter the nature of the service, program, or activity" and need not alter eligibility criteria that are "shown to be necessary for the provision of the service, program, or activity being offered."   28 C.F.R. § 35.130(b)(7)–(8); *see also Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004).   UTMB policy clearly states that a student who receives two

"Cs" *or* an "F" is subject to dismissal; Maples received two "Cs" *and* an "F."
Docket Entry No. 31-8 at UTMB_000105. While the policy does provide for the
possibility of retaking a failed rotation course, it also states that students who fail a
rotation "may be subject to dismissal." *Id.* at UTMB_000106. The faculty,
department chair, Gradings & Promotions Committee, Ad Hoc Student Committee,
and Vice President and Dean all agreed that dismissal was warranted. Requiring
high standards for future physician assistants is necessary for the proper treatment
of patients. "The decision of the College not to waive [its] requirement and lower
the standards for continued training . . . is entitled to deference." *Kaltenberger*,
162 F.3d at 437. Educators face enough challenges without having federal courts
second guess their grades and graduation decisions. *See Ewing*, 474 U.S. at 225
n.11 ("'University faculties must have the widest range of discretion in making
judgments as to the academic performance of students and their entitlement to
promotion or graduation.'") (quoting *Bd. Of Curators, Univ. of Mo. v. Horowitz*,
435 U.S. 78, 96 n.6 (1978)).

The undisputed evidence shows that UTMB complied with the ADA and
Rehabilitation Act in providing Maples with reasonable accommodations when she
timely requested them. Despite those accommodations, Maples was unable to
perform at the required level. The federal disability discrimination laws establish
only the right to reasonable accommodations for qualified individuals with

disabilities; they do not provide an automatic right to extra credit.  They certainly do not guarantee a diploma.

## IV. CONCLUSION

Because Maples has not produced any evidence creating a fact issue from which a jury would be able to conclude that UTMB dismissed her because of her ADHD or depression, she is unable to establish a claim under the ADA or Rehabilitation Act.   The Court therefore **GRANTS** Defendant's Motion for Summary Judgment (Docket Entry No. 20).

SIGNED this 28th day of September, 2012.

_____
Gregg Costa
United States District Judge